## RITTERPUSCH *v.* LITHOGRAPHIC PLATE SERVICE, INC.

[No. 74, October Term, 1955.]

*Decided January 10, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Daniel B. Leonard,* with whom were *Leonard Liepman* and *Bowie, Burke & Leonard* on the brief, for the appellant.

*Herbert Myerberg* for the appellee.

HAMMOND, J., delivered the opinion of the Court.

A jury found that the appellant, Ritterpusch, had violated his obligation as an employee by soliciting the business of customers of his employer, Lithographic Plate Service, Inc., the appellee, for a competitor with whom he was soon to become affiliated, and assessed damages against him. It is urged upon us that the trial court erred (1) in failing to grant a motion for a directed verdict on the ground that there was no evidence legally sufficient to prove the violation of any duty owed by the appellant, and (2) in instructing the jury that at the time the solicitation of business might be found to have

occurred, the appellant was, as a matter of law, an employee, owing full loyalty to his employer.

The trial court instructed the jury that the duty of fidelity and loyalty owed by an employee to an employer does not prevent him from making preparations for future competition with his employer, either in business alone or with others, but that he may not go as far as to solicit the business of customers of his employer before the termination of his employment. We think the charge correctly stated the applicable law. Therefore, if there was evidence which permitted the finding that appellant did solicit business for himself while still in the employ of the appellee, the case properly went to the jury. The evidence was conflicting on most, if not all, of the key points but the record reveals that the jury well could have resolved the conflict by deciding that the facts set out in the two succeeding paragraphs had been proven to its satisfaction and so, justifiably reached the verdict it did.

Maran Printing Company is in the business of printing, typesetting and lithographing in Baltimore. Its principal owner and operating partner is Maurice Annenberg. In 1946, he began to use the process of printing called off-set, which prints from paper-thin flexible zinc plates instead of conventional metal type. He decided to make his own plates, rather than buy from others and employed Ritterpusch as a plate maker. Soon this aspect of Maran's business was moved to a separate location and operated under the name of Lithographic Plate Service. About a year later Annenberg incorporated Lithographic Plate Service, Inc., the appellee, and transferred Maran's plate making assets to it in return for 800 shares of its stock. Maran kept 480 shares, and transferred 160 shares each to two of its old employees, Hecht and Patterson, who became secretary and treasurer, respectively, of the new company with Annenberg as president. In the beginning Plate Service, which operated as a trade shop, doing work for outsiders as well as Maran, lost money and was subsi-

dized by Maran. Until 1951 Maran paid Ritterpusch's salary. Business increased only when several large plants, including Rheem Manufacturing Co., with plants at Sparrows Point and Linden, N. J., put in off-set presses. Sales of Plate Service increased from $22,000 in 1948 to $124,000 in 1953. Four customers represented most of these sales—Rheem, about 34%, Thomsen-Ellis-Hutton, about 11%, Publication Press, 8%, and Maran, 28%. Plate Service was the only shop in Baltimore with equipment large enough to make the extra size plates Rheem needed. When Ritterpusch started to work in 1946, he was paid $70.00 a week. He did a little of everything about the plant and showed particular aptitude as a salesman. As the business began to grow, Ritterpusch grew with it and became general manager, the man whose lengthened shadow Plate Service was, and his earnings rose so that in 1953 he made $150.00 a week. Annenberg had little direct connection with, or supervision of, Plate Service. As the company prospered, Ritterpusch felt he should be paid more. In 1952 he submitted a proposal for a commission on gross business, which would rise 1% a year until it reached 5%. This was not agreed to and in November, 1953, he approached Annenberg with the proposition that Maran, Hecht and Patterson each give him 5% of their stock holdings so that then Maran would have 55% of the stock, and Hecht, Patterson and Ritterpusch each 15%. This arrangement was never consummated. In the middle of December, 1953, one Bowling told Ritterpusch that he was planning to organize a plate making business which would be in direct competition with Plate Service, and invited Ritterpusch to join him and his two associates in the new venture. Ritterpusch did not commit himself, saying that he was in a well organized company and he thought Annenberg would look out for him. Nevertheless, he gave advice to Bowling as to the kind of equipment and the amount of space that would be needed. He attended conferences with Bowling and his associates and suppliers of plate making equipment. Equipment was ordered and

delivered in December, 1953. Ritterpusch admitted that it was on his suggestion that the order included appliances large enough to do the work of Rheem Manufacturing Co., the only firm requiring extremely large plates. Bowling said he invested in the large equipment so as to be able to compete for the Rheem account. Ritterpusch said that in December, 1953, he was "in a general way" thinking of joining the new venture. On January 4, 1954, Bowling signed a lease on behalf of the new company, Lincoln Lithoplate, Inc., for space for its operations although the company was not incorporated until January 8, 1954. Bowling and his two associates purchased all stock for cash and caused all of the preferred stock and three-fourths of the common stock to be issued to them, and the other one-fourth of common stock to be issued gratis to Ritterpusch. As early as November, 1953, Ritterpusch had visited the Rheem plant at Linden, N. J. and told Siebert, the assistant purchasing agent, that he had been thinking of going into business for himself and asked "if he ever did * * * would he have a chance of getting part or all of our business up in the Linden plant." Siebert discussed the matter with his superior and Ritterpusch was told that there was no reason he could not have a fair share of the business if he proved his ability to handle it. In the Rheem Sparrows Point plant, orders originated in the sales department of which Tucker was manager, and the purchasing department was merely a conduit. In December, 1953, soon after Bowling had invited him to join the new venture, Ritterpusch talked to Tucker and asked his advice about the proposition, having in mind the doing of Rheem's work, and Tucker advised him to go into it. Between Christmas and New Year's Eve, 1953, Ritterpusch told Kisling, plant foreman for Plate Service for seven years, that he had decided to quit and asked whether he would like to go along as manager. On Saturday, January 2, 1954, he called on Annenberg, who had been home sick for several days, and told him for the first time of his intention to quit and go into a competing

business. Annenberg became quite upset and told him that there was such a limited market in Baltimore, that he couldn't be stupid enough to go into the plate making business. Annenberg says, Ritterpusch denies, that Ritterpusch replied: " '* * * I'm not dumb enough to go into business without sewing up anything * * *. I've already sewed up Rheem * * * and have them lined up, their business is twice as much as yours [Maran's], and if I only have that one account and starve on it, I'll go in.' " Ritterpusch told Annenberg that he would stay on until February 1, 1954, and when Annenberg said he would make Kisling general manager, Ritterpusch told him he had Kisling tied up and that he was taking him with him and that he was also taking Blinke, another employee. Annenberg then told Ritterpusch to come to the Service Plate plant Monday morning, January 4, and wait for him and not to "touch a single thing, don't touch any more accounts, even the ones you've been doing on the outside, I'll appoint somebody else manager as soon as I see what's in there." On Monday morning, Annenberg spoke again to Ritterpusch in the plant and told him to stay there and train whomever would be appointed manager. Ritterpusch requested permission to go to the hospital to visit his ill son and left for the rest of that day. The next day, Tuesday, January 5, Ritterpusch went to Rheem's Sparrows Point plant at quarter to nine in the morning and conferred with Eifert, head of the purchasing department, and his assistant. A memorandum of Eifert's conference with Ritterpusch was admitted in evidence pursuant to stipulation, because Eifert was unavailable to testify. It set forth that Ritterpusch told him that he was going into business for himself and would be in a position to give them the same kind of service he had given them in the past. It continued: "* * * based further upon the strong recommendations of Rog Hard and Tuck, we decided to go along with him." Tuck was the nickname of the manager of the sales department with whom Ritterpusch had consulted in December, 1953, and Hard was his assistant. From the Rheem plant, Ritter-

pusch went to Thomsen-Ellis-Hutton and, according to Ellis: "He spoke about starting up for himself and could he count on some of our business." He added that as far as he knew, Ritterpusch was in his place of business for the purpose of soliciting business for the new enterprise. Ritterpusch then went to lunch and returned to the Plate Service plant around one o'clock. Shortly thereafter, Rheem's truck arrived to take from Plate Service all of its negatives and art work which were essential to the doing of its work. Kisling, with Ritterpusch's knowledge and acquiescence, if not direction, gave the order to release the negatives and art work and ordered Rheem's driver to take them to Ritterpusch's new place of business on S. Gay St. While this was going on, Ritterpusch went to Annenberg's office across the street, in response to a summons, and because of his visits to Rheem and Thomsen-Ellis-Hutton of which Annenberg had learned, was forthwith discharged. Annenberg directed that Ritterpusch be paid for the full month of January, 1954, but Patterson refused to agree, as a matter of principle, and, finally, Ritterpusch was given a check for his full basic salary for January 4 and 5, which he accepted and cashed. Ritterpusch says that he was an employee of Plate Service at the time he called on Rheem and Ellis, that the calls were made for the account of Plate Service, and that he merely advised the customers of his resignation to take effect at the end of the month. Eifert says in the memorandum that Ritterpusch told him he would be in a position to service Rheem's account "when he left Litho Plate Service".

Beginning January 6, 1954, Rheem's sales department cancelled a number of orders which Plate Service had in process and placed them with Ritterpusch's new company, Lincoln Lithoplate, Inc. Within a period of less than thirty days, the new company had virtually all of Plate Service's customers and key employees. In 1953, appellee's sales were $124,000 with a profit of $8,000 after payment of a similar amount in officers' salaries, and in 1954 they dropped to $60,000, with a loss

of $5,000 after the payment of only $2,000 to officers. Ritterpusch's company, for 1954, had $122,000 in sales, 90% of which was represented by business from Plate Service's former customers. The Rheem account alone represented 26% of the gross volume. The business of four other former customers of Plate Service represented 40%; thus some 66% was represented by the business of five of Plate Service's former customers. Ritterpusch received a total of $11,780 in salary and bonus in 1954. Bowling and associates got $12,800 and the company earned about $12,000.

The trial court charged the jury that an employee, during the time of his employment, owes his employer the duty of fidelity and loyalty and must not injure his interests. He instructed them that an employee has the legal right, while still an employee, to make arrangements to compete with his employer by subsequently engaging in business, either by himself or with others. As soon as his employment ends, he may solicit the customers and key employees of his employer. He may advise the customers with whom he has been in contact of the proposed termination of his employment but he may not solicit their business before the termination of his employment. He then instructed them as follows: "Irrespective of the exact words used, solicitation of a customer has been done, if you find that Ritterpusch prior to the termination of his employment with plaintiff, in addition to notifying the customer of his intention to shortly leave plaintiff's employ and engage with others in a business competing with plaintiff's, attempted to induce said customer to become his customer or the customer of a prospective competitor after his employment with the plaintiff was terminated." The appellant submitted a prayer, asking the court to instruct the jury that if it found, as Ritterpusch had testified, that Annenberg told Ritterpusch on Monday, January 4, 1954, "* * * that he would ruin him", then Ritterpusch "owed no further duty of loyalty to the plaintiff and any solicitation thereafter was not improper even though

the employment relationship was not formally terminated until the following day." After the court had charged the jury, the only exception taken by the appellant was as follows: "The defendants except to the court instructing the jury as a matter of law that the termination of the employment of Ritterpusch occurred on January 5, 1954, for the reason that the jury should be permitted to find, as a fact, that the employment actually terminated on January 4th, and that thereafter said Ritterpusch owed no further duty of loyalty to the plaintiff." There is a significant difference between the request to charge the jury and the exception made to the court's charge. In the prayer, there was relied on an employer-employee relationship, which was not the normal relationship with obligation of full loyalty but one in which Ritterpusch was still an employee, but an employee who owed no duty to his employer, while in the exception to the charge, the claim is that "the employment actually terminated on January 4th", and for that reason Ritterpusch no longer owed a duty of loyalty. There was no evidence that Ritterpusch did not remain an employee until the afternoon of January 5th. The exception to the charge was on the ground only that employment could be found by the jury to have terminated on January 4th, and therefore we may not pass on the question the appellant seeks to raise, in the posture in which the case comes to us. "An instruction is properly rejected if the evidence precludes the theory on which it is based." *West v. Belle Isle Cab Co.*, 203 Md. 244, 254-5. The court could not have modified its charge to meet the appellant's objection for lack of supporting evidence. *General Rules of Practice and Procedure,* Part Three, Sec. III, Rule 6 (c) provides that "Before the jury retires * * * any party may object to any portion of any instruction given or to any omission therefrom or to the failure to give any instruction, stating distinctly the portion or omission or failure to instruct to which he objects and the specific grounds of his objection." Rule 6 (d) provides: "Upon appeal a party, in assigning error

in the instructions, shall be restricted to (1) the particular portion of the instructions given or the particular omission therefrom or the particular failure to instruct distinctly objected to before the jury retired and (2) the specific grounds of objection distinctly stated at that time; and no other errors or assignments of error in the instructions shall be considered by the Court of Appeals." Clearly, the controlling objection and the one to which appellate review is restricted, is that made after the charge has been delivered. *Washington Sub. San. Comm. v. Musgrove*, 203 Md. 231, 237.

It is our view that if the question were squarely before us, the claim of the appellant to an equivocal status, somewhere between employment and non-employment, wherein one is still on the payroll and still at work but yet with no duty of loyalty, is unsound and unsupported by any real authority. *Restatement, Agency*, Sec. 393, says the law is that "Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." Comment "e" says: "After the termination of his agency, the agent may compete with his principal as to matters for which he had been employed and may, before the termination of the agency, make arrangements to do so * * *. Thus, before the close of his employment, he may purchase a rival business and upon the termination of the agency immediately compete with his former employer. He may not, however, before the termination of his employment, solicit customers for such rival business, nor may he do other similar acts in direct competition with the employer's business." In *Wessex Dairies Limited v. Smith*, 2 K. B. 1935, 80, the defendant, a milkman, in going his rounds, informed customers on a Saturday afternoon (and perhaps on previous days of the week) that he would cease that Saturday night to be in the employment of the plaintiff, that he was going in business for himself and could supply them with milk. It was held that "He was plainly soliciting their customers as from Saturday evening * * * at a time when

the defendant was under an obligation to serve the plaintiffs with fidelity." The Justices discussed the case of *Nichol v. Martyn*, 2 Esp. 732—which has been followed, to some extent at least, by several early American cases— in which Lord Kenyon was reported to have held that a salesman could solicit business while still in the employ of another if delivery was to be only after he left that employ. Each agreed that the reporter, in whose volume the case appears, was so unreliable and inaccurate that it is doubtful that Lord Kenyon said what he was supposed to have said, and that if he had, the statement was not a true expression of the law. The *Nichol* case was expressly overruled. Greer, L.J., said in the *Wessex* case: "During the subsistence of the contract of service and during his master's time the servant has to look after, not his own interests, but those of his master. * * * '* * * It may be under particular circumstances that the injury done to his master would hardly be greater than if he had waited till he had left the service before he made his canvass. But that is not the question. The obligation to protect his master's interests lasts until the last hour of his service. The dividing line between owing his master a duty and owing him none is that imperceptible period of time between the termination of his service and the moment he acquires freedom of action after his service has terminated.'"

In *Keiser v. Walsh*, the Court of Appeals for the District of Columbia, 118 F. 2d 13, said: "An agent need not wait until he is on the street before he looks for other work. He may plan and prepare, during the agency, to engage in a competing business after it ceases. But his duty forbids him, during the agency, to ask his principal's customers to transfer their custom, even though the transfer is not to take effect until after the agency ceases." In 1953 the Court of Appeals of New York decided a case quite similar to the case at bar in many significant aspects. It is *Duane Jones Co. v. Burke*, 117 N. E. 2d 237. In that case the founder and owner of a large and successful advertising agency be-

gan to be guilty of behavior lapses that caused cancellations of large accounts. The key employees decided they would have to buy out the existing business or start their own business. Prior to July 5, one or more of them had spoken to several clients about the proposed plans and had received favorable reactions. On July 5, they told the owner of their plans and made an offer to purchase his stock. An agreement to sell and to buy was reached, which fell through on August 6. On August 7, the written resignations of six of the employees, who later became defendants, were handed in. The resignations were only as officers or directors of the agency and each contained the statement that the writer would continue his duties as an employee and "* * * 'continue to service these accounts now assigned to me, to the best of my ability.'" Between August 7 and September 10, when the new agency, which had been incorporated two weeks before, opened its doors, the employees and founders of the new agency solicited business from a number of clients of the original agency, to most of whom they had spoken of their plans before July 5, and this at a time when they were still on the payroll and working for that agency. Most of the clients of the old agency transferred to the new one. The jury awarded a very large verdict against the defendants and the Court of Appeals affirmed, because the appellants had violated their obligations of loyalty to their employer by competing while still employees. See also *Albert A. Volk Co., Inc. v. Fleschner Bros., Inc.*, 60 N. Y. S. 2d 244-5, affd. 298 N. Y. 717, 83 N. E. 2d 15; *Frank Sheridan Jonas, Inc. v. Romanat*, 94 N. Y. S. 2d 727, 730; *Connelly v. Special Road & Bridge Dist. No. 5* (Fla.), 126 S. 794; *Dondero v. Standard Emblem Co.* (R. I.), 121 A. 401; *Colonell v. Goodman*, 78 F. Supp. 845, 847, affd. 169 F. 2d 275.

Maryland decisions are in accord with the principles which have been set forth. In *Cumberland Coal & Iron Co. v. Parish*, 42 Md. 598, 605, it was said: "As between trustee and *cestui que trust*, or agent and principal, the

rule is inflexible, that the trustee or agent cannot be allowed to take the benefit of a transaction the entering into which was in violation of his duty, or where the benefit claimed and the duty required to be performed are in any respect inconsistent, the one with the other. * * * And it is now well settled that directors and managers of corporations, and other companies, are equally within the rule which guards and restrains the dealings and transactions between trustee and *cestui que trust*, and agent and his principal; such directors or managers being in fact trustees and agents of the bodies represented by them." See also *Acker, Merrall & C. Co. v. McGaw*, 106 Md. 536, 556-7-8; and *Adams Express Co. v. Trego*, 35 Md. 47, in which the claim that a divided loyalty was justified on the facts was rejected by the court.

The appellant seeks to bolster his contention that after he gave notice that he was going to resign and was told by Annenberg that he would be ruined, he could remain on the payroll and yet further his own interests rather than his employer's, by reference to several law review articles that analyze the *Duane Jones* case, cited above. These reviews suggest that the opinion was unnecessarily turgid because of the discussion of and dependence on the law of conspiracy, the action having been brought in that form, but they agree generally with the result of the case. There are suggestions in several of the reviews of supposed indications in the cases that an employee should be allowed a somewhat wider latitude in his "preparation" after he gives notice to quit than before he has done so, but it is recognized that one cannot directly solicit business for himself while he is still an employee. For example, the article in 54 Columbia L. R. 994-5, speaks of the wider latitude in "preparation" and then says: "No case, however, has permitted the employee to make a direct offer to his employer's customers while still on the payroll." The article goes on to say that if the *Duane Jones* case "involved only an employee's request that his employer's

customers follow him to a competing business, it would be an unexceptional adherence to established law." The author of the review in 38 Minn. L. R. 661, 663, says: "Notwithstanding the furor raised in the highly competitive advertising business by the instant case, it merely follows an established line of authority which seeks to impose on employees a 'level of conduct for fiduciaries—higher than that trodden by the crowd.'" See also 39 Iowa L. R. 185 and 22 Univ. of Chicago L. R. 278.

We find that the lower court properly submitted the case to the jury on a charge which correctly instructed them as to the applicable law. The judgment will be affirmed.

*Judgment affirmed, with costs.*