FINO *v.* MARYLAND EMPLOYMENT
SECURITY BOARD ET AL.

[No. 88, September Term, 1958.]

*Decided January 19, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Harold Buchman* and *Lawrence B. Coshnear* for the ap-
pellant.

*James N. Phillips, General Counsel, Maryland Department
of Employment Security,* with whom were *C. Ferdinand
Sybert, Attorney General, Bernard S. Melnicove, Special
Assistant Attorney General,* and *J. Robert Brown, General
Counsel,* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment of the trial court affirming
a decision of the Board of Appeals of the Maryland Employ-
ment Security Board, which denied benefits to the appellant
following her discharge and affirmed the decision of the Ap-
peals Referee. The ground of the decision was that her dis-
charge, and consequent unemployment, was due to her "actual
or threatened deliberate and wilful misconduct connected with
his work," under Code (1951), Art. 95A, sec. 5 (b). (Sec.
6 (b), Art. 95A of the 1957 Code uses the phrase "gross
misconduct connected with his work.")

The facts are virtually undisputed. The appellant was em-
ployed about March 1, 1957, by the Sun Ray Drug Company
to serve as a waitress in its Ranch Room restaurant at Mon-
dawmin in Baltimore City at a wage of 50 cents per hour, plus
tips. She performed her work regularly and satisfactorily for
about two months. On May 3, 1957, she was summoned to
appear before the Un-American Activities Committee, sitting
in Baltimore, on May 8, 1957. She asked the manager, Mr.

Horn, for time off to answer the summons, which was granted. He suggested that she take the whole week off. Following her appearance before the Committee, she returned to Sun Ray for her pay on Saturday, May 11, and was told that she was laid off. Mr. Horn testified that he discharged her because he learned that, in the hearing before the Committee, she had been identified as a former member of the Communist party and had invoked "the Fifth Amendment", and in so doing created adverse publicity which he felt would "hurt the business." He cited threats by customers to discontinue their patronage so long as a "Communist was working there." It was a matter of "public relations." He did not attempt to interrogate the appellant about her alleged connection with the Communist party. He told a reporter that she had left her employment voluntarily. That was "to get the pressure off him." Thereafter, the appellant filed a claim for benefits under the Maryland Unemployment Insurance Law. It is conceded that during the course of the hearing before the Committee she had been asked, but refused to give, testimony as to her connection, past or present, with the Communist party, based on her privilege against self-incrimination. She was identified through radio, television and the newspapers to the public at large as an employee of the Ranch Room, Sun Ray Drug Company, who had refused to respond to questions relating to her affiliations with the Communist party.

The appellees concede that she had a constitutional right to decline to answer, but argue that she must take the natural consequences. One consequence is that the public at large believe that she had something to hide, that she was either a Communist or, at least, a person who was unwilling to lend her aid to the Committee investigating un-American activities of a subversive character. They argue that her continued employment would have adversely affected the business interests of the employer and that her conduct rendered her unsuitable to continue in the employment. The appellant does not challenge the right of the employer to discharge her, but contends that the discharge did not render her ineligible for benefits, because her conduct, if misconduct at all, was not misconduct connected with her work. If we assume, with-

out deciding, that her refusal to answer questions propounded by the Committee was misconduct, the crucial question is whether such misconduct was connected with her work within the meaning of the statute.

The appellees rely upon the fact that the Act declares its general purpose to be to "benefit * * * persons unemployed through no fault of their own." Code (1957), Art. 95A, sec. 2. But that same section also declares a purpose to protect workers and their families from the effects of involuntary unemployment. As we said in *Tucker v. American S. & Ref. Co.*, 189 Md. 250, 258: "We are not at liberty to construe the negative words of section 2, 'through no fault of their own,' as an affirmative disqualification for 'fault,' without regard to the express provisions of section 5 * * *. If there is incongruity between the 'general policy' in section 2 and the result of particular provisions in section 5 * * *, the incongruity may be eliminated only by the Legislature."

We note that Code (1951), Art. 95A, sec. 5 (a), sets up a disqualification for benefits if an employee is discharged for a "dishonest or criminal act committed in connection with or materially affecting his work * * *." (This section was repealed by chapter 441, Acts of 1957.) It is highly significant that the phrase "connected with his work," in sec. 5 (b) omits the alternative qualification "materially affecting his work." Conduct may materially affect the future usefulness of an employee to an employer, and yet be wholly unrelated to the employment status, as, for example, where an employee beats his wife and the fact receives wide publicity. It would be a different matter if he assaulted a customer or a fellow employee. No doubt there is a distinction between obligations arising out of an employment contract, and the general obligations of citizenship or to the community at large. In its most limited sense, the word "work" might be said to refer only to the actual service he is hired to perform, but we think it may properly comprehend other obligations, such as the duty to obey proper orders, or to refrain from absenteeism. There is a general duty of loyalty to one's employer. Cf. *Ritterpusch v. Lithographic Plate*, 208 Md. 592.

As we see it, the appellees would have us incorporate in the

phrase the alternative qualification that appears in sec. 5 (a) but not in 5 (b). They seem to argue that any conduct outside of the employment relationship would raise the bar to benefits, if it sets in motion a series of events which directly affect the employer or employment. But we think the mere fact that misconduct adversely affects the employer's interests is not enough. It must be incident to the work, or directly related to the employment status. In substance the contention is, not that her refusal to answer was a breach of any duty owed to the employer, but simply that it had a tendency to alienate customers who disapproved of her supposed principles. There is no suggestion that her retention would create any other hazard to the business.

There is a dearth of authority on the point in the adjudicated cases. But as one writer puts it: "The theory * * * that misconduct, although not occurring in the course of employment, may be connected with the work if it evidences unsuitability for the work and makes retention of the worker incompatible with the employer's interests, seems unsound." Kempfer, *Disqualifications for Voluntary Leaving and Misconduct,* 55 Yale L. J. 147, 165. See also Sanders, *Disqualification for Unemployment Insurance,* 8 Vand. L. Rev. 307, 336; Teple, *Disqualification: Discharge for Misconduct and Voluntary Quit,* 10 Ohio St. L. J. 191, 198. In the recent case of *Emp. Security Board v. LeCates,* 218 Md. 202, where an employee, after hours, took one of the employer's trucks without permission, we found a connection in the fact that he gained access to the plant by reason of his employment status, and thus took advantage of the employment relation in order to commit the wrongful act. In *Massengale v. Review Board of Ind. Emp. Sec. Div.,* 94 N. E. 2d 673, 675 (Ind.), in which an employee made vigorous and repeated protests against the discharge of a fellow employee, the court recognized that the phrase in question referred to work which it was the employee's contractual duty to perform, but found a connection in a preconceived plan to take advantage of the employer and impede the progress of the work. Three judges dissented on the latter point. See also *Milne Chair Co. v. Hake,* 230 S. W. 2d 393, 396 (Tenn.), where the court rec-

ognized that a mere violation of contractual duty might not amount to misconduct connected with the work, although constituting a ground for discharge.

Since we hold that the alleged misconduct in the instant case was not so connected with the work as to raise a disqualification, under a proper construction of the statute, it is unnecessary to discuss the constitutional and other points raised by the appellant.

> *Judgment reversed and case remanded, costs to be paid by the appellees.*