**QUALITY SYSTEMS, INC.**

v.

**Samuel WARMAN, et al.**

**Civil No. L–99–2658.**

United States District Court, D. Maryland.

Feb. 16, 2001.

---

Francis R. Laws, Darrell R. VanDeusen, Desmond T. McIlwain, Kollman & Sheehan, P.A., Baltimore, MD, for Plaintiff.

Kathleen A. Ellis, Quincy M. Crawford, Paul Fenn, Piper, Marbury, Rudnick & Wolfe, Baltimore, MD, for Defendants.

## MEMORANDUM

LEGG, District Judge.

This is a suit between competitors. Plaintiff, Quality Systems, Inc. ("QSI")[1], contends that Defendant, Windermere[2], engineered a mass raid on QSI's workforce and customers. Defendants, in turn, contend that Plaintiff defamed and competed unfairly against them. Extensive discovery established that neither the Complaint nor the Counterclaim are strong enough to warrant a trial. Accordingly, for the reasons stated below, the Court will by separate order:

(i) GRANT Defendants' Motion for Summary Judgment; and

(ii) GRANT Counterclaim Defendants' Motion for Summary Judgment.

## I. Background

### A. The Parties

QSI and Windermere both supply technical personnel to United States defense, aerospace, and intelligence agencies, including the National Security Agency ("NSA"). The agencies typically obtain personnel by contacting a central government agency, the Maryland Procurement Office ("MPO"). The MPO obtains personnel through a network of contractors and subcontractors. QSI and Windermere are two such subcontractors.

Although the staffers physically work at the government agency, often for years, they remain employees of the subcontrac-

---

1. QSI is a Virginia corporation that employs over 1,000 employees.

2. Windermere owns both WITS and Windermere HDS, LLC. WITS performs predominantly the same type of services as its parent Windermere, and employs approximately 165 employees.

tor. The subcontractor bills the contractor (or the MPO) for the staffer's services at a contract rate. The subcontractor pays the staffer's salary and benefits. In any given project, the staffers may be supervised by the government agency or the subcontractor.

This case concerns two contracts, IISS and SWIFT, that MPO uses to obtain technology staff for the NSA. To recruit personnel for NSA, MPO entered into a prime contract with Computer Sciences Corporation ("CSC"). CSC, in turn, utilizes a number of subcontractors to provide NSA with technology workers.[3]

The subcontractors will submit resumes of potential staffers to CSC. CSC will vet the resumes and submit the appropriate candidates to the MPO. The MPO makes the ultimate decision about whom to hire for a particular position.

Defendant David Warman was a manager at QSI. Warman tendered his resignation on July 1, 1999; his last day at QSI was July 7, 1999. Warman began working at Windermere on July 7th. While at QSI, Warman supervised the other individual Defendants, all of whom were managers: Bernard Bigelow, Robert George, Richard Hippert, Timothy Johnson, Ronaldo Serrano, and Albert Villines. This close-knit group was colloquially known within QSI as the "Friends of Dave."

Within six weeks of Warman's departure, the other individual Defendants had all left QSI to join Windermere. After the departure of the Individual Defendants, 31 non-managerial, technical employees also left QSI for Windermere. None of the Individual Defendants or non-managerial staff had signed either an employment contract with QSI or a covenant-not-to-compete.

## B. Procedural History

QSI filed suit in August 1999. Along with the Complaint, QSI filed a motion for

a Temporary Restraining Order and a Preliminary Injunction. QSI primarily alleged that Warman, before leaving his employment at QSI: (i) breached a duty of loyalty by orchestrating a mass defection of QSI employees and soliciting business for Windermere; and (ii) misappropriated trade secrets.

Windermere and Warman deny these allegations. Warman contends that prior to his departure he did not contact QSI employees about working for Windermere. The Defendants maintain that neither Warman nor the other individual Defendants solicited business for Windermere while on the QSI payroll. They also assert that they did not take any QSI trade secrets.

In November 1999, the Defendants filed a counterclaim alleging (i) defamation, and (ii) tortious interference with contractual relations. In their counterclaim, Defendants contend that QSI spoke disfavorably about Windermere to QSI employees and customers in order to dissuade them from associating with Windermere.

Plaintiffs maintain that even if they made the alleged statements, (i) the statements were not defamatory; (ii) the statements were true; and (iii) Defendants cannot prove they were injured by the statements.

On November 17, 1999, the Court held a hearing on the motion for a preliminary injunction. The Court denied the motion and the parties proceeded to discovery.

In May 2000, Defendants and the Counterclaim Defendants filed motions for summary judgment. On January 29, 2001 and February 5, 2001, the Court heard oral argument.

## C. The Hearing

The facts developed at the summary judgment hearing establish the following:

**3.** Neither QSI nor Windermere have an exclusive contract with CSC to work on the IISS or the SWIFT contract.

(i) QSI cannot demonstrate that the Defendants took any trade secrets with them when they left, or that Defendants have misused any trade secrets in operating Windermere. Moreover, most, if not all, of the information allegedly misappropriated does not qualify as a trade secret.

(ii) In exiting QSI, neither Warman nor the other Defendants improperly raided QSI's workforce.

(iii) Before leaving QSI, several of the individual Defendants were in contact with QSI customers. There is no evidence, however, from which a reasonable jury could conclude that the contacts played any part in a customer's decision to withhold business from QSI or give business to Windermere.

(iv) The statements made by QSI manager William Shernit were not defamatory. Windermere has offered no evidence that the statements caused damage. In fact, at the hearing, counsel for Windermere stated that QSI's heavy-handed reaction to the employee resignations alienated many QSI staffers, prompting them to quit QSI and seek jobs at Windermere.

## II. Summary Judgment Standard

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).

In determining whether there is a genuine issue of material fact, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987). The Court must take care not to foreclose trial when the case presents genuinely disputed, material facts.

Nevertheless, as the Fourth Circuit made clear in *Thompson Everett, Inc. v. National Cable Advertising, L.P,* 57 F.3d 1317, 1322 (4th Cir.1995), (i) "the mere existence of some disputed facts does not require that a case go to trial," (ii) "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case," and (iii) "the *quality and quantity* of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Id.* at 1323 (citations omitted) (emphasis added).[4]

Further, the complexity of a case does not make summary judgment inappropriate. To the contrary, Rule 56 may prove a particularly appropriate and useful tool for sorting out the "unusual entanglement of legal and factual issues frequently presented in [complex cases such as] antitrust cases ... [and] is favored as a mechanism to secure the just, speedy and inexpensive determination of a case, when its proper use can avoid the cost of trial." *Id.* at 1322 (citations omitted).

The essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505,

---

**4.** Thus, "if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment.... While we have recognized generally that when considering a motion for summary judgment, the district court must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion, we hasten to add that those inferences must, in every case, fall within the range of reasonable probability and *not be so tenuous as to amount to speculation or conjecture.*" *Thompson Everett,* 57 F.3d at 1323 (citations omitted) (emphasis added).

91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991).

## III. Analysis

### A. Breach of Loyalty

■ In every employment contract, there is an implied duty that an employee must act solely for the benefit of his employer in all matters within the scope of his employment. *See Maryland Metals v. Metzner,* 282 Md. 31, 382 A.2d 564, 567 (1978). There is no set rule denoting when an employee has breached his fiduciary duty; rather, a court must examine the facts of each particular case. In analyzing the facts of the instant case, it is helpful to see what other courts have considered to be a breach of loyalty.

■ An employee is free to search for another job prior to leaving his current position. *See id.* at 569. A group of employees may agree to leave together, such as when a partner at a law firm leaves with his associates. *See* Restatement (Second) of Agency § 393 cmt. e (1957). An employee may not, however, systematically induce other employees to leave their jobs if his purpose of enticement is to destroy an integral part of his employer's business. *See Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957).

■ Briefly stated, an employee may discuss job offers with his circle of friends and the group may debate whether to leave together. Such discussions are a normal part of workplace intercourse. A breach of loyalty may occur, however, when an about-to-leave employee targets employees outside his normal circle and uses his position to induce them to defect.

■ An employee may make arrangements to compete with his employer prior to leaving his job. *See Maryland Metals,* 382 A.2d at 569. The employee may also advise current customers that he is leaving. *See id.* at 569 n. 3. An employee is under no obligation to disclose the precise nature of his plans to his employer, unless he has acted inimically to the employer's interest. *See id.* at 569. Departing employees may purchase a rival business or equipment, secure land options, and obtain financing for a prospective new business. *See id.; C-E-I-R, Inc. v. Computer Dynamics Corp.,* 229 Md. 357, 183 A.2d 374, 379 (1962) (dictum). An employee may not, however, actively solicit business in competition with his employer. *See id.; see also Ritterpusch v. Lithographic Plate Service,* 208 Md. 592, 119 A.2d 392 (1956).

### 1. Solicitation of Employees

#### a. Managers

■ There is insufficient evidence from which a reasonable jury could find that Warman solicited his managerial staff to resign *en masse.* Plaintiff relies heavily on an e-mail from Hippert to Serrano that speaks of "Dave's Group" and a "plan" to leave. Weighing against this e-mail is the deposition testimony of all the Individual Defendants that Warman did not solicit them, but they themselves initiated contact with Windermere.

Even if Dave's Group had decided to leave together, QSI would have no claim. *See* Restatement (Second) of Agency § 393 cmt. e (1957). The individual defendants were part of the same circle and it would have been permissible for them to discuss joint employment opportunities. They could have resolved to leave together without breaching a duty of loyalty.

#### b. Non-managerial technical staff

■ Following the first summary judgment hearing, the Court determined that it needed more information on solicitation of QSI non-managerial employees who were outside of the Individual Defendants' circle. The Court requested Counsel to

query a representative sample of the approximately thirty former QSI employees who defected to Windermere. Counsel agreed to depose a group of six of the former QSI employees, to be chosen at random.

The six employees each testified that: (i) none of the Individual Defendants discussed WITS with them while the Individual Defendants were still employed by QSI; (ii) they initiated contact with the Defendants regarding employment opportunities at WITS; and (iii) their decision to leave QSI was unrelated to the conduct of the Defendants.

Furthermore, the deposition testimony of other WITS and QSI employees taken during discovery earlier in the case corroborates the Defendants' assertion that they did not solicit QSI employees while the Defendants were still employed by QSI. Thus, there is insufficient evidence to sustain the charge that the Defendants executed a systematic plan to raid QSI.

### 2. Solicitation of Customers

QSI alleges that Defendants met with QSI customers, while they were still employed by QSI, in order to persuade the MPO and the CSC to add Windermere as a subcontractor on the IISS and SWIFT contracts.

### a. IISS

The first group of meetings about which QSI complains occurred in June and August of 1999.[5] All of these meetings involve the IISS contract. There is some debate about what actually happened at the meetings and it is difficult to say whether Defendants' conduct crossed the line into impropriety.[6]

Whatever happened at the meetings, it is not actionable because the MPO and CSC never added WITS to the IISS contract. Accordingly, QSI suffered no damage.[7] In order to establish a successful claim, QSI must prove injury.

### b. SWIFT

■■■ The second group of contacts with CSC and MPO personnel concerns the SWIFT contract. Because Windermere was added to the SWIFT contract, the Court must analyze the contacts themselves.

QSI alleges that in either June or July 1999, Warman spoke with James Foy of CSC about the SWIFT contract. Foy testified that Warman informed him at a lunch meeting that he was leaving QSI. According to Foy, Warman told him in a subsequent telephone conversation that he had joined Windermere and requested that CSC accept Windermere as a SWIFT subcontractor.

Warman's contact with Foy does not constitute a breach of loyalty. Although Warman did solicit business from Foy for Windermere, there is insufficient evidence from which a reasonable jury could find that this conversation took place prior to Warman's departure from QSI. Foy testified that he is unsure of the exact date of this conversation.[8] Foy also testified that

---

5. The customers with whom Defendants met were Jim Brown of the CSC, Lisa Seehousz of the MPO, and Mike Ware of the MPO.

6. Brown and Seehousz each stated that Warman told them that he was leaving QSI and that QSI employees would probably leave with him. According to Seehousz, Warman also said that he was arranging to have his new company added as a subcontractor on the IISS contract and that she felt he may have been soliciting her support to add the new company to the contract. Additionally,

Seehousz stated that Warman asked her not to tell anyone at QSI that he was leaving.

7. QSI contends that it lost business on the IISS contract when the MPO decided to increase the number of subcontractors it used to avoid putting so many of its eggs in one basket. The MPO's decision, however, was not caused by the random contacts between the MPO and the Defendants.

8. Foy testified that the conversation could have taken place either a week prior to, several days prior to, or on the day of July 7, 1999.

during this conversation Warman told him that he had left QSI already. Warman testified—and his calendar entry corroborates—that the conversation took place after he had already left QSI. Accordingly, the evidence is inadequate to support a finding that Warman solicited Foy before his departure from QSI.

■ QSI further alleges that in August 1999, Hippert met with Phyllis Gaskill of the MPO, while he was still an employee of QSI. During the interview, Hippert requested to be added to the SWIFT contract, but as an employee of Windermere, not QSI.

Hippert's contact with Phyllis Gaskill does not justify an action for breach of duty of loyalty. Although he held the title of manager at QSI, Hippert acted more as an employee, providing technical work at NSA on the various government contracts. At the interview, Hippert was essentially seeking work for himself as a potential contract employee, not selling Windermere.[9]

Furthermore, there is no evidence that Hippert's interview with Phyllis Gaskill was the actual cause of any injury to QSI. QSI has not offered any evidence that Hippert was hired or otherwise acquired an inside track because of his interview. Nor has QSI offered evidence that it even supplied a candidate to fill the position. According to Ms. Gaskill's affidavit, Hippert did not have all the skills needed for the position but she hired him anyway because she did not receive any other candidates from CSC. Accordingly, his behavior is not actionable as a breach of loyalty.

## B. Trade Secrets

■ QSI alleges that the Defendants misappropriated QSI trade secrets, specifically:

9. It was not uncommon for CSC to receive the resume of the same candidate from numerous subcontractors. In that sense, the subcontractors acted like employment recruiters. If CSC selects the candidate, the subcontractors would decide among themselves who would get the contract.

(i) the May 1999 Management Report, which contains QSI financial information;

(ii) the recruiting database, which contains 15,000 to 20,000 resumes obtained from applicants, headhunters, and various internet sites;

(iii) the employee database, which contains personal and salary information about QSI employees; and

(iv) contract files, which contain information regarding projects QSI is working on at the MPO and projects that will become available at the MPO.

QSI's claim has three fatal flaws:

(i) As an initial matter, the Defendants deny taking any trade secrets. Apart from Plaintiff's suspicions, there is no evidence that Defendants took the documents with them when they left QSI or that they have used the documents to ruin QSI's business.

(ii) Most, if not all, of these items fail to meet the statutory definition of a trade secret because they are readily ascertainable by other means. *See* Md.Code Ann., Commercial Law § 11–1201(e) (1997).

(iii) Finally, as Plaintiff's counsel acknowledged, the information no longer has any continuing economic value.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's trade secrets claim.

## C. Counterclaim

■ There are two aspects to the counterclaim.[10] The first concerns the allegedly defamatory statement of QSI manager Williams Shernit's at a QSI "all-hands" employee meeting. Shernit said that "the company cannot and will not stand by

10. It is difficult to believe that Windermere would have troubled to sue QSI for defamation if QSI had not sued Windermere first.

when someone acts in a disloyal fashion, even to the point of criminal actions."

The "all-hands" meeting took place right after Warman's departure, when the situation was confusing. Shernit was essentially relating his suspicions rather than accusing the Defendants of criminal conduct. He does not identify a specific person or a specific crime. His choice of the language "even to the point of" denotes tentativeness. Thus, Shernit's statement is on the border of defamation, but does not cross the line.

Furthermore, Windermere has not shown that it suffered any damage whatsoever from Shernit's statement. In fact, Windermere's counsel admitted at oral argument that QSI's heavy-handed manner of addressing the employee resignations alienated QSI staffers, prompting many to leave QSI for Windermere. In order for a defamation claim to succeed, there must be a showing that the plaintiff has sustained actual injury. *See Metromedia, Inc. v. Hillman*, 285 Md. 161, 400 A.2d 1117, 1123 (1979) (noting "under *Jacron* in Maryland one no longer may recover on a declaration which merely alleges that a person publicly called an individual a thief"). Windermere has not shown actual injury.

The second component of the counterclaim is Defendants' allegation of tortious interference with economic relations. Defendants assert that QSI managers spoke with five individuals at NSA and characterized WITS as "unethical." Windermere's evidence on this point is vague and weak. At his deposition, Robert Pozgar of Windermere testified that an NSA official decided to withhold business from Windermere because of negative information the official had received from his subordinates. According to the official, the subordinates, who were unnamed, received the impression from QSI management that Windermere has acted unethically.[11]

Windermere fails to provide any testimony from any NSA staff members about what QSI management allegedly said. Nor can Windermere even identify a specific QSI manager who spoke with NSA about Windermere. Accordingly, the evidence is wholly inadequate to support a jury finding that QSI tortiously interfered with Windermere's economic relations.

### D. Other claims

In addition to claims for misappropriation of trade secrets and breach of a duty of loyalty, in its complaint, QSI sets forth four other causes of action. QSI barely developed a factual and legal argument in support of these claims. Accordingly, the Court will address each claim with equal brevity.

### 1. Conversion

QSI alleges that the Defendants converted QSI property. There is no evidence, however, that the individual Defendants intentionally took any property following their departure from QSI. Although QSI has offered evidence that George, Villines, and Hippert did not return their employee handbooks immediately upon their departure, QSI did not suffer any injury as a result. QSI's claim for conversion must, therefore, fail. *See Yost v. Early*, 87 Md.App. 364, 589 A.2d 1291 (1991).

### 2. Intentional Interference with Advantageous Contractual Relations

QSI primarily alleges that CSC breached its contract with QSI when it failed to give QSI two weeks to backfill vacant positions on the SWIFT contract. QSI offers no evidence, however, that it had such a contractual promise from CSC or that the Defendants induced CSC to breach this promise.

---

11. Pozgar's actual testimony on the subject is under seal, but it is equally vague. The NSA official's name has not been placed on the record because of the confidential nature of his work.

### 3. Intentional Interference with Prospective Business Relations

QSI alleges that Defendants intentionally interfered with QSI's economic prospects when they solicited QSI customers. As previously stated, QSI cannot establish that these limited contacts were the actual and direct cause of any damage. Nor is there evidence that the Defendants acted with an unlawful purpose to cause damage to QSI. *See Mates v. North American Vaccine, Inc.,* 53 F.Supp.2d 814, 828 (D.Md.1999).

### 4. Civil Conspiracy

QSI has failed to offer evidence for a reasonable jury to find that the Defendants were engaged in a systematic effort to rob QSI of customers or employees. Furthermore, the Defendants have not committed an unlawful or tortious act. Because Maryland does not recognize civil conspiracy as an independent cause of action, without proof of a separate tortious act, its claim for civil conspiracy must fail. *See Alexander & Alexander, Inc. v. B. Dixon Evander & Assoc., Inc.,* 336 Md. 635, 650 A.2d 260, 265 (1994).