**THOMPSON EVERETT, INC.,**
Plaintiff–Appellant,

v.

**NATIONAL CABLE ADVERTISING, L.P.;**
Cable Networks, Inc.; Cable Media Corporation, Defendants–Appellees.

No. 94–1656.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 31, 1995.

Decided June 27, 1995.

ARGUED: Stephen Earl Baril, Williams, Mullen, Christian & Dobbins, P.C., Richmond, VA, Theodore Voorhees, Jr., Covington & Burling, Washington, DC, for appellant. Yvonne Susan Quinn, Sullivan & Cromwell, New York City, for appellees. ON BRIEF: John J. Walker, III, Williams, Mullen, Christian & Dobbins, P.C., Richmond, VA, for appellant. Richard C. Pepperman, II, Sullivan & Cromwell, New York City, Stephen A. Northup, Robert D. Seabolt, Mays & Valentine, Richmond, VA, for appellee Cable Networks; Charles M. Allen, Jr., Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, VA, Daniel G. Swanson, Julia A. Dahlberg, Gibson, Dunn & Crutcher, Washington, DC, for appellee National Cable Advertising; Thomas E. Spahn, McGuire, Woods, Battle & Boothe, Richmond, VA, Gerald J. Fields, Raymond J. Soffientini, Stewart Klein, Battle Fowler, New York City, for appellee Cable Media.

Before NIEMEYER and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MICHAEL and Senior Judge PHILLIPS joined.

## OPINION

NIEMEYER, Circuit Judge:

Thompson Everett, Inc., a self-styled "independent cable television representative firm" engaged in placing "spot" advertising on cable television, contends that it is being illegally denied access to cable television companies and the "opportunity to earn rep commissions" in connection with the sale of cable air time for spot advertising. Thompson Everett has sued the traditional cable representatives (referred to as "traditional cable reps") who have exclusive representation contracts with cable television companies, alleging that the traditional cable reps are interpreting and enforcing their exclusive contracts in a concerted effort to exclude Thompson Everett from the "cable rep" business and the commissions flowing from that business. Thompson Everett contends that the traditional cable reps' conduct violates

**1320**

sections 1 and 2 of the Sherman Act (declaring restraints of trade and monopolization illegal), Virginia's antitrust laws, and related common law.

The district court granted the defendants' motion for summary judgment on the antitrust claims, concluding that Thompson Everett failed to present evidence sufficient to show that it suffered an "antitrust injury" and to establish a horizontal conspiracy among defendants to use their exclusive representative agreements to injure Thompson Everett. The district court also concluded that the exclusive agreements did not have a substantial anti-competitive effect. It dismissed the remaining claims on the ground that the defendants acted properly and in good faith in protecting their contractual rights under the exclusive cable company representation contracts.

Because we conclude that Thompson Everett, if injured at all, has not been injured by anything forbidden by the antitrust laws, we affirm.

## I

Defendants National Cable Advertising, L.P., Cable Networks, Inc., and Cable Media Corporation are "traditional cable reps" retained by cable television companies to serve as their sales agents to sell cable air time to advertisers for spot advertising.[1] The traditional cable reps' sole function is to represent cable companies to obtain for them the greatest possible advertising revenues. The traditional cable reps compete with each other for the right to represent cable companies and for the contracts by which the cable companies grant the exclusive right to represent them. These contracts are of short duration, often about one year, and when they expire, the traditional cable reps then compete for new contracts. As a result of this competition, cable companies are represented by various cable reps and the commissions for representation have declined. Recent years' commission rates have dropped from about 28% of spot time billings to a general range

of 20% to 22%, and new contracts are being signed for as low as 15% of billings. Both the cable companies and the traditional cable reps claim that these exclusive contracts have a legitimate business purpose. The cable companies contend that they need a loyal, skilled sales staff, dedicated to furthering the cable companies' interests in developing advertising revenue from the sale of air time.

By employing exclusive contracts, the cable companies contend, they establish an ongoing relationship with the traditional cable reps so that the reps may work against sales quotas and focus their attention on securing the best available rates for the cable companies and on chasing limited advertising dollars in competition with other media. The traditional cable reps similarly maintain that exclusive contracts are necessary to protect their considerable investments in market and demographic research and technological innovation. They contend also that exclusive contracts provide financial stability, enabling them to invest in training a larger and more skilled sales staff.

Under these exclusive representation contracts, the traditional cable reps are compensated only through commissions on sales of spot air time to advertisers or advertising agencies. Absent an exclusive agreement, they argue, their effort would be undermined by "free riders" who could take advantage of the traditional cable reps' efforts in generating sales without making any of the necessary investment.

Thompson Everett is a Virginia corporation formed in 1984 for the purpose of "conducting both a general advertising agency business and representing agencies in their placement of advertising in various media." It claims that it is "independent" in that neither advertising interests nor cable companies own its stock. Its goal, similar to that of media buyers hired by advertisers to place their advertisements in the media, is to negotiate the cheapest price for the most air time or media exposure. On behalf of its clients, advertisers or advertising agencies, Thomp-

---

1. These traditional cable reps are companies founded in the early 1980s and are owned by the cable companies. National Cable is a limited partnership in which four cable companies are limited partners. The other two are corporations whose stock is owned by cable companies. All three operate nationally representing only cable companies, but not always the same ones.

son Everett aims to place advertising not only on cable television, but also in other media such as network and local broadcast television, network cable television, radio, or printed media, whichever is most consistent with its clients' needs and desires.

When dealing with cable companies, Thompson Everett typically attempts to bypass the traditional cable reps and deal directly with the cable companies, using the leverage of its collective representation of numerous advertisers and advertising agencies in its negotiations. When successful, Thompson Everett demands receipt of the commissions that otherwise would be paid to the traditional cable reps. If the cable company declines to pay Thompson Everett a commission or pays a commission which Thompson Everett considers to be inadequate, Thompson Everett "creates" a commission for itself through a practice referred to as "popping the advertiser." Under this practice, Thompson Everett negotiates a rate with the cable company that is below the amount budgeted by the advertiser for the spot time, but it informs the advertiser that the cable company would only agree to sell at the budgeted amount and retains the difference as its commission.

Thus, even though Thompson Everett has dealt directly with cable companies and has received commissions from them for selling their air time, its efforts and loyalties are always tied to the advertisers and advertising agencies. Unlike the traditional cable reps, who seek *to maximize* the cable company's revenue from the sale of spot air time, Thompson Everett seeks *to minimize* that amount in its representation of advertising interests. For that reason, Thompson Everett readily acknowledges, it cannot sign exclusive cable rep contracts with the cable companies.[2]

Neither Thompson Everett nor the traditional cable reps buy cable air time on their own account and then resell it. Rather, they act as agents, performing the service of negotiating a price for cable air time on behalf of their clients. The traditional cable reps represent only the interests of cable companies, seeking to sell cable company air time in competition with other media. Much like a real estate broker representing the seller in a real estate transaction, these traditional cable reps negotiate the best rate obtainable for acceptance by the cable company. Thompson Everett, on the other hand, serves in the transaction in a position analogous to the buyer's real estate broker, representing the potential buyer of cable air time. While the buyer's agent may consider cable air time for its clients' advertising, it may also consider other media. Thompson Everett maintains that even from its position as the buyer's agent in the transaction, it can provide the same service provided by the traditional cable reps to the cable companies without the cable companies' need to engage a traditional cable rep as an intermediary.

Troubled by Thompson Everett's disregard for their exclusive cable rep contracts, the traditional cable reps began to insist on their contractual rights of exclusive representation, advising cable companies that only the cable reps were contractually entitled to represent the cable companies and to receive commissions. In response, Thompson Everett filed this action.

In its complaint, Thompson Everett claims that the traditional cable reps are acting in concert in using their exclusive contracts to exclude Thompson Everett from the cable rep market and to drive Thompson Everett out of business. Thompson Everett alleges that the traditional cable reps entered into a horizontal conspiracy with each other and a vertical conspiracy with the cable companies to use their exclusive contracts for the purpose of fixing prices and maintaining high commission rates, eliminating competition among themselves and excluding Thompson

---

**2.** As Thompson Everett's chief operating officer explained in response to questioning:

> Q. If the interest of the advertiser are inconsistent with selling spot cable for a particular cable operator, you are going to do what is in the advertiser's interests, not what is in the interests of the cable operator; is that correct?

> A. That's correct.

> She also stated that the company does not sign exclusives because it will utilize alternative means, such as placing advertising into other media, if the cable spot time is not well-suited or properly priced for the advertiser's purposes.

Everett and others as competitors, causing the cable companies to boycott Thompson Everett, and extending each cable company's natural monopoly. It bases its complaint on sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and similar provisions of Virginia's antitrust laws, Va.Code §§ 59.1–9.5 and 59.1–9.6. Thompson Everett also alleges related statutory and common law claims. It requests a declaratory judgment that the cable rep's activities are illegal and an injunction prohibiting such conduct in the future. It also demands treble and punitive damages of an unspecified amount and reasonable attorney's fees.

Granting the defendants' motion for summary judgment, the district court ruled that the injury alleged by Thompson Everett was not of the type and proximateness that is enforceable under the antitrust laws, citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 539–45, 103 S.Ct. 897, 909–12, 74 L.Ed.2d 723 (1983) (holding that a combination of indirectness of injury, a non-antitrust type of injury, and speculative damages preclude antitrust enforcement). *See Thompson Everett v. National Cable Advertising,* 850 F.Supp. 470, 478–79 (E.D.Va. 1994). The district court concluded that even though Thompson Everett and others may have considered Thompson Everett to be a competitor of the cable reps, there is no dispute over how Thompson Everett's business actually operates. Focusing on Thompson Everett's actual method of doing business, the district court concluded that Thompson Everett was not a competitor in the market in which the alleged violations occurred. *Id.* at 476–79. The district court also found no evidence to support the allegation of a horizontal conspiracy, *id.* at 480, or the allegation that the vertical exclusive agreements had a substantial anti-competitive effect, *id.* at 482. The remaining state and common law claims were dismissed for similar reasons. *Id.* at 482–83.

## II

Thompson Everett contends preliminarily that the district court "misapplied the standard required for deciding a motion for summary judgment" and erroneously suggested that summary judgment was especially appropriate in the context of antitrust litigation. Thompson Everett adverts to the district court's statements that "summary judgment is an important tool for dealing with antitrust issues," 850 F.Supp. at 474 (quoting *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696 (4th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992)), and that the "very nature of antitrust litigation encourages summary disposition of such cases when permissible," *id.* (quoting *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 475 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988)). Additionally, Thompson Everett points to the district judge's oral comments at the summary judgment hearing arguably expressing his understanding that this court prefers to resolve complex legal issues through summary judgment. In its brief, however, Thompson Everett states, "While the District Court acknowledged *the proper standard* under Rule 56(c), it ignored facts supporting [Thompson Everett's] claims, decided disputed facts in favor of defendants, and gave defendants the benefit of all inferences from the facts." (Emphasis added). It would thus appear that Thompson Everett does not take issue with the district court's articulation of the applicable legal standard as much as the manner in which the court applied that standard, yielding too readily to the defendants on summary judgment because of a mistaken belief that such preference should be given in antitrust cases.

▮▮▮▮ While Rule 56 is to be applied to antitrust cases no differently from how it is applied to other cases, that is not to say that the summary judgment device is not an appropriate and useful tool for resolving antitrust cases. On the contrary, because of the unusual entanglement of legal and factual issues frequently presented in antitrust cases, the task of sorting them out may be particularly well-suited for Rule 56 utilization. *See Oksanen,* 945 F.2d at 708. The summary judgment practice does not become disfavored simply because a case is complex. Rather, it is favored as a mechanism to secure the "just, speedy and inexpensive deter-

mination" of a case, *see* Fed.R.Civ.P. 1, when its proper use can avoid the cost of trial. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). While it is axiomatic that Rule 56 must be used carefully so as not improperly to foreclose trial on genuinely disputed, material facts, the mere existence of some disputed facts does not require that a case go to trial. The disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Thus, if the evidence is "merely colorable" or "not significantly probative," it may not be adequate to oppose entry of summary judgment. *Id.* at 249–50, 106 S.Ct. at 2511.

■ While we have recognized generally that when considering a motion for summary judgment, the district court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion," *Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993), we hasten to add that those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture. *See Sylvia Development Corp. v. Calvert County,* 48 F.3d 810, 817 (4th Cir.1995). Moreover, the inferences which may be drawn vary from one substantive area of the law to another. Thus, on summary judgment motions in antitrust cases, the Supreme Court has instructed that when there is evidence of conduct that is consistent with both legitimate competition and an illegal conspiracy, courts may not infer that an illegal conspiracy has occurred without other evidence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986).

■ At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly. And in reviewing a summary judgment, we apply *de novo* the same standard that the district court was required to apply for granting the motion for summary judgment. *See Sylvia Development,* 48 F.3d at 817. Accordingly we analyze the record in this case *de novo* and measure the evidence properly presented against the requirements for establishing a violation of antitrust law.

### III

■ The thrust of Thompson Everett's complaint is that it is being denied access to cable companies by the traditional cable reps' concerted activity in insisting on their rights under their exclusive representation contracts with the cable companies. Thompson Everett wants a return to a status quo ante when it was able to purchase air time for advertisers directly from the cable companies and to receive a commission from the cable companies for those sales, notwithstanding the exclusive cable rep contracts. Thompson Everett asserts, therefore, that the competition provided by its bids on behalf of advertisers for cable time has been preempted by concerted activity and that it has been injured in its business by the loss of commissions.

The district court concluded that Thompson Everett failed to present evidence of a horizontal conspiracy among the traditional cable reps to exclude Thompson Everett from the market of serving cable companies as sales agents.

Thompson Everett made no effort to prove that the traditional cable reps conspired to *enter* into their exclusive rep contracts or to continue their renewal. Rather, it contends that the traditional cable reps conspired to *enforce* such contracts. This claim presents several problems. Absent evidence that any party to an exclusive representation contract was considering abandoning such a contract or not renewing it upon termination, Thompson Everett has the nearly insurmountable task of proving that a party to such a contract who seeks to enforce it, even at the

urging of a competitor, is pursuing an illegal conspiracy under the antitrust laws. Without more evidence, Thompson Everett cannot prevail upon the court to draw the inference that concerted activity is the cause for contractual enforcement. *See Matsushita,* 475 U.S. at 587–88, 106 S.Ct. at 1356–57.

Thompson Everett argues, however, that further evidence supports its claim of concerted activity. It points to evidence that a trade association in the cable television industry circulated a questionnaire to determine how the cable industry could improve and compete with other media. Responses to the questionnaire, prepared independently by each member of the association, were collected and circulated by the association. While the general conclusion, reached independently by the traditional cable reps, was that the cable industry could best compete with other media through the enforcement of the exclusive rep contracts, there is no evidence that they engaged in any further concerted activity following the circulation of this information. Moreover, unless the exclusive contracts were themselves illegal, any concerted activity was not aimed at achieving an unlawful objective. *See Cooper v. Forsyth County Hosp. Auth.,* 789 F.2d 278, 281 (4th Cir.), *cert. denied,* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986). Accordingly, we reach the same conclusion as the district court, that even with evidence of information sharing, pertaining to the benefits of contract enforcement, there is still no evidence that the cable reps embarked on a "conscious commitment to a common scheme designed to achieve an unlawful objective." *See Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (citation omitted).

■ Even with this conclusion, we are still left with Thompson Everett's claim that each individual exclusive representation contract illegally denied Thompson Everett the opportunity to compete.

## IV

Absent a horizontal agreement among the traditional cable reps to prevent Thompson Everett from serving as a cable rep, the barriers to Thompson Everett's access to the cable companies consist of (1) the exclusivity provisions in the cable rep contracts binding the cable companies to a single sales representative, and (2) Thompson Everett's position in the market as a representative of advertising interests, which precludes it from providing some essential cable rep services to cable companies.

If the cable companies elect to sell their spot air time through exclusive agents, and the terms of those exclusive contracts do not violate the antitrust laws, then Thompson Everett cannot complain that it does not have access to the cable companies if it is unwilling to compete for these exclusive contracts. Because of its position in the market, Thompson Everett understandably is not in a position to enter into exclusive cable representation contracts with the cable companies, because to do so would be inconsistent with its business of representing advertisers and placing their advertisements in media other than cable television. Even absent the exclusivity requirement of these rep contracts, Thompson Everett's position in representing the advertising side of the transaction to obtain air time at the *least* possible cost raises a barrier to its representation of cable companies. Thompson Everett could not simultaneously perform that function and represent the cable companies who seek to obtain the *greatest* amount of revenue for air time. The inherent conflict of interest would force it to perform one function at the expense of the other.

Thompson Everett nevertheless argues that it should be able to contact the cable companies directly and provide a more efficient service by representing both sides of the transaction for a smaller combined fee. In essence, it would have the market restructured to require cable companies to sell their air time through methods not previously selected by those companies.

Thompson Everett may surely attempt to persuade the cable companies to alter the method they have selected for doing business. If Thompson Everett were successful, the cable companies could readily refuse to renew their exclusive, relatively short-term contracts with the cable reps, and deal di-

rectly with Thompson Everett. The barrier to this result is that imposed by the independent decision of the cable company and the cable rep to enter into an exclusive contract. Thus, unless the exclusive representation contracts between the cable companies and the traditional cable reps are by their terms illegal, the only barriers to Thompson Everett's representation of cable companies are (1) enforceable contractual provisions and (2) Thompson Everett's self-selected position in the market. Since neither of these barriers are created by anything illegal under the antitrust laws, Thompson Everett has no basis for asserting an antitrust claim.

▮▮▮ Section 4 of the Clayton Act grants private persons the right to sue for violations of the antitrust laws if the person has been injured in his business or property "by reason of" an antitrust violation. 15 U.S.C. § 15(a). A private person may not, however, recover damages simply by establishing that his injury was "causally linked to an illegal presence in the market." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). Rather, the damages sought must flow from *that conduct* which is proscribed by the antitrust laws. *See Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697–98. Because the antitrust laws are intended to protect competition, and not simply competitors, only injury caused by damage to the competitive process may form the basis of an antitrust claim. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). *See also Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 734–35 (9th Cir.1987); *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 540 (7th Cir.1986).

In the circumstances of this case, we agree with the district court that Thompson Everett is not a would-be competitor with the cable reps and is not being denied access to the cable company sales service market by any act in violation of the antitrust laws. *See Associated Gen. Contractors,* 459 U.S. at 539–40, 103 S.Ct. at 909–10; *Brunswick,* 429 U.S. at 488–89, 97 S.Ct. at 697–98. Rather,

Thompson Everett is simply seeking to substitute its proposed method of serving cable companies for that selected by the cable companies without demonstrating that the substitution would advance the competitive process. *See Rutman Wine,* 829 F.2d at 734–35; *Great Escape,* 791 F.2d at 540.

## V

▮▮▮ In addition to Thompson Everett's difficulties in establishing antitrust injury, Thompson Everett failed to present any evidence that the exclusive sales rep contracts go beyond the legitimate business purposes for which they were created and thus constitute an unreasonable restraint of trade. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 54–57, 97 S.Ct. 2549, 2559–61, 53 L.Ed.2d 568 (1977).

The cable companies are free to choose any method of selling air time so long as the method chosen does not violate the antitrust (or other) laws. Thus, the cable companies could sell time through in-house sales agents, exclusive representatives, non-exclusive representatives, or through some combination of these methods. In this case, Thompson Everett challenges the cable companies' selection of exclusive representation contracts to sell air time.

▮▮▮ The exclusive sales rep contracts impose non-price vertical restrictions which are not per se illegal under the antitrust laws, and such restrictions are not disfavored as long as they do not go beyond the legitimate business purposes for which they are used. *See Continental T.V., supra.* A contract creating such non-price vertical restrictions, even though temporarily burdening competition for providing a selling service to the cable company, is scrutinized by considering whether that lessening of competition outweighs the benefits such a business arrangement might have in enabling the cable company to compete better with other media for advertising dollars. *See Satellite Television & Assoc. Resources, Inc. v. Continental Cablevision of Va., Inc.,* 714 F.2d 351, 355 (4th Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984).

As we have noted, the exclusive contracts in this case are typically of short duration, usually terminable after a year, and contain performance criteria, which, if not met, may justify earlier termination. Other contracts allow the cable company to terminate without cause upon notice ranging from 30 days to one year. The evidence shows that these contracts are negotiated in a competitive context, with the various cable reps bidding on the commission rates that they are willing to receive for their service. The record also reveals that, as a consequence, cable companies have not remained with one cable rep and that the commission rates have steadily declined.

As buyers in the market for sales representation services, the cable companies find the exclusive representation contract advantageous in their efforts to compete with other media to attract advertising dollars. From the buyer's point of view, the exclusive contracts enable each cable company to have a loyal sales staff dedicated to furthering that company's particular interest. The cable companies can establish a relationship with a sales representative and impose sales quotas, which ultimately results in increased "inter-media" competition in the larger market defined by the sale of media time for advertising dollars. The sellers in the market for sales representation services, i.e., the traditional cable reps, similarly find that these exclusive contracts serve their legitimate business interests. They are able to devote resources to market and demographic research, invest in technological innovation, and develop a specially tailored sales staff, all for the benefit of a particular cable company, with the reasonable expectation of recovering this investment. These mutually beneficial aspects of the exclusive cable representation contract are particularly important to the parties, considering that spot cable advertising is relatively new, and advertisers must be persuaded to move their business from more traditional media to the cable companies. At bottom, the evidence shows that not only does competition exist in the sales representation service market, but it is actually enhanced in the larger, overarching market for advertising dollars.

While the exclusive nature of these cable rep contracts may temporarily preempt competition in providing representation services to a particular cable company, Thompson Everett has failed to establish that this relatively minor restriction outweighs the benefits of increased "inter-media" competition in the larger market for advertising dollars. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 333–35, 81 S.Ct. 623, 631–32, 5 L.Ed.2d 580 (1961) (exclusive dealing arrangements are prohibited only if they have "a substantial adverse effect on competition"); *Advanced Health–Care Servs. v. Radford Community Hosp.,* 910 F.2d 139, 151 (4th Cir.1990) (same).

For the foregoing reasons, we agree with the district court that Thompson Everett has not advanced evidence that the short-term exclusive contracts between the traditional cable reps and the cable companies have a substantial anti-competitive effect.

## VI

Thompson Everett also contends that the traditional cable reps are using the exclusive representation contracts to leverage the lawful monopolies of the cable companies into an unlawful monopoly in the cable company sales representation business. To maintain this argument, Thompson Everett focuses on a market defined only by the selling service provided by traditional reps to cable companies. That analysis, however, fails to take into account the competition existing among the cable reps for exclusive rep contracts and, more importantly, overlooks the realities of that market and the overarching market for advertising dollars. The cable rep service is only an agency service, since the traditional cable reps do not buy air time on their own account. As agents, cable reps act on behalf of cable companies who compete with other media for advertising dollars. Cable television advertising is a relatively new medium and is not widely accepted by advertisers. To sell cable spot time, therefore, the cable companies are confronted with the task of persuading advertisers that cable spot advertising is an effective method for conveying the advertiser's message to the public. The dimensions

of the narrowest market in which the cable companies operate, therefore, are measured by the various media which are interchangeable for conveying the advertiser's message to the public in the cable company's geographic area. *See Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir.1974) (holding that the relevant market is defined by the scope of "reasonable interchangeability").

Evidence supports yet a broader geographical market in some circumstances. Because advertising dollars are limited and many advertising efforts are regional or national, aimed at areas much larger than those served by local cable companies, the cable companies must often pursue regionally and nationally committed advertising dollars and therefore to compete in those circumstances with other cable companies as well as with other regional and national media.

Fatal to Thompson Everett's monopolization claim is the absence of any evidence of monopoly power, such as price control or monopoly profits, or threatened monopoly power in any of these markets. On the contrary, the evidence in the record shows that cable advertising is an incipient part of the industry and that the business of providing sales services to cable companies is a service for which commission rates are competitively established and have been dropping. In short, Thompson Everett has been unable to identify any evidence that the cable reps possess monopoly power or threaten to obtain that power in a relevant market. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602–03, 105 S.Ct. 2847, 2857–58, 86 L.Ed.2d 467 (1985).

## VII

■ Thompson Everett's common law claim, that the traditional cable reps have interfered with Thompson Everett's business relations through their concerted conduct in enforcing the exclusive cable rep contracts, lacks merit for the same reasons discussed in connection with its antitrust claims. No concerted activity was established and the reps' rights under the exclusive contracts are legally protected interests. In these circumstances, Thompson Everett has failed to es-

tablish the essential elements of the tort of interference with business relations. *See* Restatement (2d) of Torts § 773 (any good faith assertion of a legally protected contractual interest is not actionable).

Accordingly, the judgment of the district court is

*AFFIRMED.*