In re W. Ryan HOVIS, Trustee for Marine Energy Systems Corporation, Debtor.

W. Ryan Hovis, Trustee for Marine Energy Systems Corporation, Plaintiff,

v.

General Dynamics Corporation, Electric Boat Corporation, Siemens Westinghouse Power Corporation and Viacom, Inc., Defendants.

Bankruptcy No. 07–01929–B.
Adversary No. 98–80220.

United States Bankruptcy Court, D. South Carolina.

April 22, 2005.

Steven Angstreich, Levy, Angstreich, Finney, Philadelphia, PA, for Debtor and Plaintiff.

*ORDER GRANTING, IN PART, SUM- MARY JUDGMENT MOTION OF DEFENDANTS GENERAL DY- NAMICS CORPORATION AND ELECTRIC BOAT CORPORATION, AND DENYING CROSS–MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF, W. RYAN HOVIS, TRUSTEE FOR MARINE ENERGY SYSTEMS CORPORATION*

WM. THURMOND BISHOP, Chief Judge.

Before this Court are (1) a Motion for Summary Judgment, filed on October 13, 2004, by defendants General Dynamics Corporation and Electric Boat Corporation (collectively, General Dynamics), and (2) a Cross–Motion for Partial Summary Judgment, filed on October 13, 2004, by plaintiff, W. Ryan Hovis, as Chapter 7 Trustee for Marine Energy Systems Corporation (MESC). The parties submitted opposition briefs and reply briefs to the respective motions and oral argument was had on the motions at a hearing in Charleston, South Carolina on February 3, 2005. For the reasons set forth herein, summary judgment is granted in favor of General Dynamics as to Counts I, II, III, V, VI, VIII and XII of the Second Amended Complaint, denied as to Counts IV and VII; and MESC's Cross–Motion for Partial Summary Judgment is denied in its entirety.

## FINDINGS OF FACT

1. General Dynamics owned a facility in Charleston, South Carolina, which it used in the 1970s to manufacture tanks for the transportation of liquefied natural gas (LNG). After the company suspended LNG tank production in 1980, the Charleston facility was put to other uses, including building parts for nuclear submarines, producing waste treatment tanks and constructing hydrofoils.

2. In late 1993, General Dynamics decided to sell the assets of the Charleston facility. It retained Goldman Sachs to help with the transaction.

3. Soon after being retained, Goldman Sachs prepared a document (GS Document) that described the business opportunity presented by the Charleston facility. The majority of the GS Document was devoted to the possible resumption of the LNG-tank manufacturing business. The GS Document also contained a short section describing the possible use of the facility to manufacture barge mounted power plants (BMPPs). Goldman Sachs distributed the GS Document to potential investors.

4. Goldman Sachs required potential investors to execute and return a confidentiality agreement (Confidentiality Agreement), prior to receiving a copy of the GS Document. The Confidentiality Agreement included a non-reliance provision, which read as follows:

> We acknowledge that neither you, nor Goldman Sachs or its affiliates, nor your other Representatives, nor any of your or their respective officers, directors, employees, agents or controlling persons

within the meaning of Rule 12b–2 under the Securities Exchange Act of 1934, as amended, makes any express or implied representation or warranty as to the accuracy or completeness of the information, and we agree that no such person will have any liability relating to the information or for any errors therein or omissions therefrom. We further agree that we are not entitled to rely on the accuracy or completeness of the information and that we will be entitled to rely solely on such representations and warranties as may be included in any definitive agreement with respect to the Transaction, subject to such limitations and restrictions as may be contained therein.

(Confidentiality Agreement ¶ 5.)

5. In early 1994, William J. Gilliam (Gilliam) expressed interest in acquiring assets of the Charleston facility. At the time, Gilliam was the chairman and sole shareholder of New Charleston Capital, an investment firm based in Charleston. In his capacity as chairman of New Charleston Capital, Gilliam signed the Confidentiality Agreement.

6. Goldman Sachs sent Gilliam a copy of the GS Document. After receiving the GS Document, Gilliam and other MESC representatives engaged in discussions with Goldman Sachs and General Dynamics, which led to the execution of an Asset Purchase Agreement, dated June 10, 1994 (the APA).

7. In 1992, before General Dynamics had any dealings with Gilliam, General Dynamics entered into a memorandum of understanding (the MOU) with Westinghouse Electric Corporation (Westinghouse). The purpose of the MOU was to encourage the two companies to work together in the area of BMPPs. By its own terms, the MOU automatically expired in September 1994. (MOU § 3.1.) The MOU provided that either party could unilaterally terminate the MOU at any time. (*Id.* §§ 3.1 and 4.4.) By letter dated April 22, 1994, Westinghouse elected to terminate the MOU. (Letter from R. Zwirn to D. Nickerson.) General Dynamics informed Gilliam within a matter of days that the MOU had been terminated. .

8. The APA, dated June 10, 1994, provided that General Dynamics would sell and Gilliam's company, New Charleston Capital, would purchase "certain specified assets associated with [General Dynamics'] Charleston, South Carolina facility." (APA at 1.) The assets to be acquired were listed on schedules to the APA. In consideration for the assets, MESC agreed to pay $12 million at the closing; plus it agreed to pay General Dynamics royalties on sales of LNG tanks and BMPPs. (APA §§ 2.5 and 2.6.)

9. As part of the deal, the parties also agreed to a Technical Support Agreement (TSA), pursuant to which General Dynamics agreed to provide engineering support services to New Charleston Capital, including design and engineering services relating to the manufacture of LNG tanks and BMPPs. (APA § 6.4 and Exh. C thereto.) Work performed under the TSA would be billed to New Charleston Capital. (TSA § 4(b).) The TSA expired on July 30, 1999, unless extended by mutual written agreement or terminated in accordance with its terms. (TSA § 3(a).)

10. On October 27, 1994, General Dynamics and MESC entered into an Amendment to the APA (the Amendment). In it, MESC and General Dynamics endeavored to eliminate any possible uncertainty as to the identity of the assets that were the subject of the transaction. They agreed in the Amendment, in pertinent part, as follows:

Section 1. *Schedules.* The Seller and the Purchaser hereby acknowledge that the Schedules delivered by the Seller to the Purchaser pursuant to the terms of the Asset Purchase Agreement, dated as of June 10, 1994, by and between the Seller and the Purchaser (the *"Asset Purchase Agreement"*) are complete and accurately reflect the list of assets to be purchased by the Purchaser pursuant to the Asset Purchase Agreement.

11. The APA closed on December 22, 1994. The entire $12 million purchase price was borrowed by New Charleston Capital from the State of South Carolina, Jobs Economic Development Authority. Upon closing, New Charleston Capital transferred the purchased assets to Marine Energy Systems Corporation (MESC), a South Carolina corporation created for the purpose of receiving the purchased assets. Gilliam was MESC's sole shareholder and chairman. (MESC and New Charleston Capital are collectively referred to hereafter as MESC.)

12. As MESC's former general counsel Saul Gliserman testified at his deposition that, in 1995 and 1996, Gilliam and other MESC representatives had numerous discussions with Westinghouse and others in which they complained about General Dynamics' alleged failure to turn over intellectual property. There were meetings at which the subject was discussed in Orlando, Florida; Charleston, South Carolina; Washington, D.C. and New York, New York. In the same time frame, MESC communicated its belief to General Dynamics that General Dynamics should have turned over certain technology as part of the APA.

13. In 1997, MESC filed for bankruptcy under Chapter 11. As a debtor-in-possession, MESC filed its plan of reorganization in May 1998. (Modified Second Amended Plan, May 4, 1998, amended July 18, 1998.) This Court confirmed the plan on July 2, 1998. The confirmation order made no mention of any possible claims against General Dynamics. MESC did not list any claims against General Dynamics in any of its disclosure statements. (*See* Modified Revised Second Amended Disclosure Statement, May 4, 1998.) MESC also failed to list any claims against General Dynamics in its schedules and statements.

14. On October 15, 1998, MESC filed an adversary proceeding against General Dynamics. It alleged two counts: one for breach of contract and the other for reformation. In the contract claim, MESC asserted that General Dynamics breached the APA by not turning over certain unidentified intellectual property. The reformation count pleaded in the alternative that, if the actual language of the APA did not carry out the intent of the parties to convey the intellectual property, then the allegedly defective wording "was inserted by, or appropriate language was omitted by, the Defendants . . . through fraud, accident or mistake." (Original Compl. ¶ 38.) MESC asked the Court to reform the APA to reflect the parties' purported intent that such property be included. (*Id.*)

15. The plan of reorganization failed, and on November 19, 1998, MESC's bankruptcy was converted to a Chapter 7. The Court appointed W. Ryan Hovis to act as Trustee. In November 1998, General Dynamics moved to dismiss the complaint. This Court granted the motion in part and denied it in part, striking part of Count I and all of Count II. (Order of October 28, 1999.) MESC filed an amended complaint in January 2000, asserting five counts. Count I asserted the pre-existing claim for breach of contract. The amended complaint added counts for breach of the implied covenant of good faith, specific performance, fraud and constructive fraud. On June 26, 2003, MESC filed a "Third

Amended Complaint," which added Westinghouse and Viacom, Inc. as defendants and expanded the number of counts to thirteen. The Third Amended Complaint (hereafter the Complaint) added claims against General Dynamics for negligence, negligent misrepresentation, detrimental reliance, and conspiracy. It also substantially expanded the allegations in its pre-existing breach of contract and fraud claims.

16. The Third Amended Complaint asserted four claims against Westinghouse: breach of contract (Count IX); fraud (Count XI); declaratory judgment (Count XII) and conspiracy (Count XII [sic]). This Court granted summary judgment in favor of Westinghouse on each of the claims asserted against it on statute-of-limitations grounds. (Order of November 17, 2003.)

17. On the return date of the motions filed by the parties, counsel for General Dynamics conceded that the Bankruptcy Code tolled the statute of limitations as to the Trustee's claims.

## STANDARD FOR GRANTING SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is a favored mechanism "to secure the 'just, speedy and inexpensive determination' of a case." *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1322–23 (4th Cir.1995) (quoting Fed.R.Civ.P. 1).

"Where a movant [supports] its motion with affidavits or other evidence which, unopposed, would establish its right to judgment, the non-movant must proffer countering evidence sufficient to create a genuine factual dispute." *In re Dig It, Inc.*, 129 B.R. 65, 66 (Bankr.D.S.C.1991). "To counter a motion for summary judgment, the non-movant may not rest on its pleadings or mere assertions of counsel." *Id.* at 66–67. The "obligation of the non-moving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990)). Furthermore, the mere existence of disputed facts does not require that a case go to trial. *Thompson*, 57 F.3d at 1323. "The disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of evidence offered to create a question of fact must be adequate to support a jury verdict." *Id.* Any inferences drawn in favor of the nonmoving party must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Id.*

## LEGAL ANALYSIS

MESC asserts nine claims against General Dynamics in its Second Amended Complaint: Count I—Breach of Contract; Count II—Breach of the Implied Covenant of Good Faith and Fair Dealing; Count III—Specific Performance; Count IV—Fraud; Count V—Constructive Fraud; Count VI—Negligence; Count VII—Negligent Misrepresentation; Count VIII—Detrimental Reliance; and Count XII—Conspiracy. Counts IX, X and XI were asserted solely against the Westinghouse defendants and have been dismissed previously.

For the reasons set forth below, General Dynamics' motion for summary judgment is granted as to all counts against it except for Count IV—Fraud and Count VII—Negligent Misrepresentation. In addition, MESC's cross-motion for partial summary judgment is denied in its entirety.

## I. GENERAL DYNAMICS' MOTION FOR SUMMARY JUDGMENT

### Statute of Limitations

As counsel for General Dynamics conceded at the outset that the provisions of the Bankruptcy Code tolled the statute of limitations for MESC's claims, the statute of limitations is no longer a viable defense to MESC's claims in this adversary proceeding.

### Res Judicata and Judicial Estoppel

■ General Dynamics contends that all of MESC's claims are barred by the doctrines of res judicata and judicial estoppel. Under the doctrine of res judicata, a bankruptcy court's order of confirmation is treated as a final judgment with res judicata effect. *Varat Enterprises, Inc. v. Nelson, Mullins, Riley and Scarborough*, 81 F.3d 1310, 1315. Pursuant to 11 U.S.C. § 1141(a), all parties are bound by the terms of a confirmed plan of reorganization. *Id.* "Consequently, parties may be precluded from raising claims or issues that they could have or should have raised before confirmation of a bankruptcy plan, but failed to do so." *Id.* Similarly, under the doctrine of judicial estoppel, a Chapter 11 debtor's failure to disclose a claim in its Schedules or Disclosure Statement bars the debtor from litigating that claim after confirmation of a plan of reorganization. *See, e.g., Oneida Motor Freight Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir.1988); *Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570, 571–72 (1st Cir.1993); *Monroe County Oil Co. v. Amoco Oil Company*, 75 B.R. 158, 162 (S.D.Ind.1987).

■ The Court finds that MESC's Count I claim for breach of contract is barred by judicial estoppel. MESC did not disclose its claim until after the confirmation of the plan of reorganization. It was only then that MESC disclosed its claims by filing this action. While MESC has alleged that it did not learn of its purported claims until after the confirmation order had been entered, this contention is negated as to its breach of contract claims by the admissions of Saul Gliserman, MESC's former General Counsel. At his deposition, Mr. Gliserman testified that MESC was aware as early as 1995 that it had not received certain assets that it contends it should have received under the APA. Moreover, the APA specifies that the assets were due to be transferred at the closing of the transaction, in December 1994. There is no reason that MESC could not have discovered through the exercise of reasonable diligence that it did not receive all of the purchased assets.

■ The Court finds that there are questions of fact as to whether MESC knew or should have known of its tort claims prior to plan confirmation. Accordingly, whether those claims are barred by res judicata and judicial estoppel are issues that are deferred until trial.

### Count I—Breach of Contract

In Count I, MESC alleges that General Dynamics breached four provisions of the APA: §§ 2.1(d), 2.1(b), 2.1(e) and 3.5. The Court concludes that MESC's Count I claims are barred by judicial estoppel as discussed above. As for three of the provisions, §§ 2.1(d), 2.1(b) and 3.5, the Court concludes that there are additional grounds for granting summary judgment.

■ **Section 2.1(d).** MESC alleges that General Dynamics did not turn over all of the intellectual property purchased under the APA. But the evidence is undisputed that General Dynamics delivered each and every one of the items listed on Schedule 2.1(d)—the list of Intellectual Property assets to be conveyed. To get around this fact, MESC insists that it is entitled to intellectual property above and beyond that listed on Schedule 2.1(d). However, the Court finds that argument to be without merit, and that it is clear from the text of the APA that the only intellectual property that the parties intended to include in the transaction was listed on Schedule 2.1(d).

The parties' intent is shown by, among other things, Section 2.1 of the APA, which states that General Dynamics would sell to MESC "all of the assets of the Business, other than the Excluded Assets . . . ." In turn, Section 2.2 specifies that assets are "Excluded Assets" unless they are included on a schedule. Thus, the only intellectual property assets MESC purchased were listed on Schedule 2.1(d). Furthermore, if there had been any doubt as to the parties' intentions, it was removed by the Amendment in which the parties agreed that the schedules to the APA were "complete and accurately reflect[ed] the list of assets to be purchased." The Amendment, thus, confirmed that the assets listed on Schedule 2.1(d) were the only intellectual property assets to which MESC was entitled.

**Section 2.1(b).** MESC contends that General Dynamics breached Section 2.1(b) of the APA by failing to deliver the proposals listed on Schedule 2.1(b) of the agreement. Schedule 2.1(b) lists 14 budgetary estimates and a letter of understanding. The evidence is undisputed that General Dynamics physically delivered copies of the documents. While MESC alleges that General Dynamics breached the APA by canceling the budgetary estimates, there is no evidence that this occurred. In any event, it is irrelevant whether General Dynamics cancelled the budgetary estimates because they were intended to remain in effect only for limited periods of time and they would have expired prior to the APA closing. Indeed, the budgetary estimates shown on Schedule 2.1(b) each included a "validity" date specifying the date on which each estimate would expire.

■ **Section 3.5.** MESC also contends that General Dynamics breached § 3.5 of the APA because some of the items of intellectual property listed on Schedule 2.1(d) were jointly developed by General Dynamics and Westinghouse pursuant to the MOU, and, as a result, Westinghouse also had the right to use those assets. In Section 3.5 of the APA, General Dynamics represented that the intellectual property was "free and clear of any Lien" and that "Seller has not received any notice of infringement of or conflict with ·asserted rights of others." The undisputed evidence shows that General Dynamics complied with these representations. There is no evidence that MESC had any problem with its ability to use any of the purchased assets. The fact that Westinghouse may also have had the right to use certain of the intellectual property is beside the point. In Section 2.1 of the APA, General Dynamics pledged that it would "sell, transfer, convey and deliver" to MESC "all of [its] right, title and interest in and to" the purchased assets. General Dynamics did exactly that. It transferred to MESC all of the interest in the assets that it had.

In addition, the APA expressly contemplated Westinghouse's right to use certain of the intellectual property. In Section 2.1(d) of the APA, the parties agreed that General Dynamics' obligation to convey

the intellectual property was "subject to the limitations of any memorandums of understanding . . . in effect with respect to the assets listed on Schedule 2.1(d)." The MOU was one such memorandum of understanding. Indeed, it is the only MOU that the parties have identified. Furthermore, MESC received a copy of the MOU, and the MOU was specifically listed in the exhibits to the APA.

## Count II—Breach of the Implied Covenant of Good Faith

The implied covenant of good faith and fair dealing exists in every contract. *See Chamison v. HealthTrust, Inc.- the Hosp. Co.*, 735 A.2d 912, 920 (Del.Ch. 1999); *see also Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995). It requires parties to interpret and act reasonably upon the language of their agreement. *Chamison*, 735 A.2d at 920. "This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." *Id.* The covenant cannot contravene the parties' express agreement or be used to forge a new agreement beyond the written language. *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

In Count II, MESC contends that General Dynamics breached the implied covenant by (1) misrepresenting facts concerning the BMPP and LNG businesses in the Goldman Sachs GS Document and (2) by allegedly terminating the MOU in November 1993. Both of MESC's contentions fail as a matter of law. With respect to the first contention, the APA contains an integration clause that provides that the APA "supersedes any prior understandings, agreements or representations by or among the parties." (APA § 10.10.) Statements in the GS Document are, thus, not part of the APA and cannot form the basis for a claim for breach of an implied term of that agreement.

MESC's contention that General Dynamics breached the implied covenant by terminating the MOU in November 1993 fares no better. The MOU would have expired by its own terms in September 1994. Thus, it is irrelevant who terminated the agreement. Moreover, MESC lacks evidence to support its assertion. The facts are that Westinghouse terminated the MOU unilaterally pursuant to an April 22, 1994 letter—a letter that was shared with MESC almost immediately and which was listed in the exhibits to the APA. The Court, therefore, grants summary judgment as to Count II.

## Count III—Specific Performance

In Count III, MESC seeks specific performance of the APA. However, specific performance is a remedy, not a claim. In order to establish that it is entitled to the equitable remedy of specific performance, MESC must first show that General Dynamics breached the APA. *See Vaughan v. Creekside Homes, Inc.*, Civ. A. No. 1043, 1994 WL 586832, at *4 (Del.Ch. June 17, 1994) (master's report) ("The remedy of specific performance is limited to rights arising out of a contractual relationship."), *approved*, Civ. A. No. 1043–S, 1994 WL 586833, at *1 (Del. Ch. Oct. 7, 1994). Because the Court grants summary judgment as to MESC's claim for breach of contract, it also grants summary judgment on its "claim" for specific performance.

## Count IV—Fraud

According to MESC, General Dynamics defrauded it by means of false statements in the GS Document. In its motion, Gen-

eral Dynamics maintains that summary judgment should be granted because MESC could not have reasonably relied on statements in the GS Document in light of the non-reliance provision in the Confidentiality Agreement and §§ 3.14 and 10.10 of the APA. In the alternative, General Dynamics contends that MESC's fraud claim fails as a matter of law because MESC cannot show that the GS Document contains any false statements.

The Court has doubts as to whether MESC can prevail on its fraud claim. Nonetheless, it concludes that there are genuine issues of fact that preclude the entry of summary judgment on this count.

### Count V—Constructive Fraud

■ In Count V, MESC purports to state a claim for constructive fraud. Unlike actual fraud, a claim of constructive fraud requires the existence of a confidential or fiduciary relationship. *Woods v. State*, 314 S.C. 501, 506–07, 431 S.E.2d 260, 263–64 (Ct.App.1993); *Ardis v. Cox*, 314 S.C. 512, 516–17, 431 S.E.2d, 267, 270 (Ct.App.1993); *Pitts v. Jackson Nat'l Life Ins. Co.*, 352 S.C. 319, 334, 574 S.E.2d 502, 509 (Ct.App. 2002).

■ It is undisputed that this was an ordinary commercial transaction between sophisticated parties. A large, well-known law firm represented MESC. MESC's chairman, Gilliam, was a highly experienced investment banker. Investment bankers, a major accounting firm and in-house counsel also assisted MESC. The Court finds these facts fatal to MESC's constructive fraud claim. *See Woods*, 314 S.C. at 506, 431 S.E.2d at 264 (affirming summary judgment on constructive fraud claim where no evidence of fiduciary relationship); *Ardis*, 314 S.C. at 517, 431 S.E.2d at 270 ("Being an arm's length transaction between mature, educated people, we find this matter fails to meet the elements necessary to show constructive

fraud."); *Poco–Grande Invs. v. C & S Family Credit, Inc.*, 301 S.C. 323, 325, 391 S.E.2d 735, 735–36 (Ct.App.1990) (affirming summary judgment on constructive fraud claim where arm's length transaction with "sophisticated and mature businessmen").

### Count VI—Negligence

■ In Count VI, MESC contends that General Dynamics was negligent because it failed to stamp the word "confidential" on documents given to Westinghouse under the MOU. MESC maintains that, as a consequence, Westinghouse gained access to proprietary information relating to the construction of BMPPs that it would not otherwise have had. To establish the tort of negligence, the plaintiff must demonstrate, among other elements, a duty of care owed by the defendant. *Regions Bank v. Schmauch*, 354 S.C. 648, 668, 582 S.E.2d 432, 443 (Ct.App.2003). "It is essential to liability for negligence to attach that the parties shall have sustained a relationship recognized by law as the foundation of a duty of care. Where this relationship is 'too attenuated,' a duty will not arise." *Ravan v. Greenville County*, 315 S.C. 447, 467, 434 S.E.2d 296, 308 (Ct.App. 1993).

■ Here, the relationship was not only "too attenuated"; it was non-existent. The evidence is undisputed that General Dynamics and Westinghouse entered into the MOU in September 1992. Westinghouse terminated the agreement before the APA was signed. Indeed, MESC asserts that it was terminated in November 1993, which was prior to the time that MESC and General Dynamics first encountered one another. General Dynamics could not have owed a duty of care to MESC prior to the time that MESC and

General Dynamics had anything to do with one another.

Accordingly, summary judgment is granted as to MESC's negligence claim. *See Morris v. Mooney*, 288 S.C. 447, 449, 343 S.E.2d 442, 443–44 (1986) (dismissing negligence claim because defendant owed no duty to plaintiff); *see also S.C. State Ports Auth. v. Booz–Allen & Hamilton, Inc.*, 289 S.C. 373, 376, 346 S.E.2d 324, 325 (1986) ("The absence of any one of [the negligence] elements renders the cause of action insufficient.").

### Count VII—Negligent Misrepresentation

MESC alleges, as an alternative to its fraud claim, that General Dynamics is liable for the tort of negligent misrepresentation. General Dynamics contends in its motion that this claim is barred as a matter of law by the "economic loss doctrine." *See Bishop Logging Co. v. John Deere Indus., Equip., Co.*, 317 S.C. 520, 455 S.E.2d 183 (Ct.App.1995). It also contends that the claim is legally deficient on the same grounds it sought summary judgment on MESC's fraud claim. As with the claim for fraud, the Court concludes that there are genuine issues of material fact that prevent the entry of summary judgment on MESC's Count VII claim for negligent misrepresentation.

### Count VIII—Detrimental Reliance

In Count VIII, MESC attempts to assert a claim for "detrimental reliance." South Carolina does not recognize a cause of action by that name, and MESC conceded as much in its papers and at the hearing. Summary judgment is entered in General Dynamics' favor on this count.

### Count IX—Conspiracy

General Dynamics contends that MESC's conspiracy count fails as a matter of law for a variety of reasons. The Court need not reach these arguments, however, because MESC agreed to the dismissal with prejudice of its Count XII conspiracy claim as part of its December 16, 2004 settlement with Westinghouse. Summary judgment is granted as to Count XII.

## II. MESC'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

MESC contends in its cross-motion for summary judgment that there are no genuine issues of disputed fact and judgment should be entered in its favor as a matter of law with respect to liability issues regarding its claims for breach of contract (Count I), breach of the implied covenant (Count II), fraud (Count IV), constructive fraud (Count V), negligence (Count VI) and negligent misrepresentation (Count VII). Its motion is for partial summary judgment, as it does not contend that it is entitled to a judgment at this time with respect to the amount of damages.

The Court concludes that MESC's motion should be denied. MESC is not entitled to summary judgment on its claims for breach of contract, breach of the implied covenant, constructive fraud and negligence for the reasons that the Court has decided to grant summary judgment on those counts in favor of General Dynamics. As for the fraud (Count IV) and negligent misrepresentation (Count VII) claims, questions of material fact preclude the requested relief.

## III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that General Dynamics' Motion for Summary Judgment is GRANTED as to Count I (breach of contract), Count II (breach of implied covenant of good faith), Count III (specific performance), Count V (constructive fraud), Count VI (negligence), Count VIII (detrimental reliance) and Count XII (conspiracy), and DE-

NIED as to Count IV (fraud) and Count VII (negligent misrepresentation).

IT IS FURTHER ORDERED that MESC's Cross–Motion for Partial Summary Judgment is DENIED in its entirety.